PAUL F. FITZGERALD, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 28811.)

SECURITY MUTUAL FIRE INSURANCE COMPANY, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 28816.)

Court of Claims, April 13, 1950.

*Wesley L. Waite* and *Stanford H. Waite* for Paul F. Fitz-gerald, claimant.

*Curtiss D. Matterson* for Security Mutual Fire Insurance Company, claimant.

*Nathaniel L. Goldstein, Attorney-General (Arthur W. Matt-son, Sidney B. Gordon* and *Robert J. Cooney, Jr.,* of counsel), for defendant.

LOUNSBERRY, P. J.  On September 21, 1947, at about 8:20 P.M., Daylight Saving Time, the claimant, Paul F. Fitzgerald, was a passenger in his own car, which was being driven by a friend, Arthur E. Peck, Jr., northeasterly along State Highway Route No. 30, toward the village of Canton.  The weather was clear, dry, and very windy.  It was dark, or nearly so, and the car

lights were on high beam. The road was reasonably straight and level and sight distance was good. The car's speed was between forty and forty-five miles per hour.

A dark object suddenly loomed up in the road some fifty feet ahead. The driver applied his brakes and swung left, but could not avoid it. In the ensuing collision the claimant, who had been dozing, was severely injured.

The object proved to be half, or a little better than half, of a large elm tree which had fallen across the road. The elm grew along the south side of the road, just outside the highway right of way, and was of the V-crotch type, the trunk dividing about eight or ten feet above the ground into two main sections or leaders. The southerly section had fallen some two and a half years earlier into the adjoining meadow. The remaining section leaned toward the highway and its branches reached entirely across the pavement.

It is clear from the evidence that even a casual observer on the highway would have seen that part of the tree had already fallen and that the remainder leaned toward and over the highway, that there was a split down the trunk from the point of the first break and signs of decay around that break. On closer examination, he would have discovered clear evidence of decay in the trunk and remaining leader, and that the tree swayed dangerously in the wind, the split opening as much as two inches. Examination by an expert would have revealed that only a small portion of the trunk was alive at all, just enough to maintain bark and foliage. Decay had proceeded for at least ten or fifteen years and was so far advanced that the strength of the trunk was almost completely gone. The tree was likely to fall at any moment.

The State had ample constructive notice of the dangerous condition of the tree. State highway maintenance patrolmen, who had standing instructions to remove dangerous limbs and trees, had passed by it regularly and had frequently mowed the grass at its base. They did nothing, although the danger should have been obvious to a child. There is a conflict in the testimony as to whether or not a tree expert in the employ of a power company pointed out this particular tree to a State highway engineer as being in a dangerous condition.

It is now well established that the State is under a duty to make a reasonable inspection of trees along State highways and to trim or remove such trees or portions thereof as are discovered to constitute a danger to users of State highways. (*Julian* v. *State of New York*, 187 Misc. 146; *Messinger* v. *State*

*of New York,* 183 Misc. 811; *Brown* v. *State of New York,* 58 N. Y. S. 2d 691; *Tagg* v. *City of Lockport,* 228 App. Div. 319, affd. 254 N. Y. 582; *McGarey* v. *City of New York,* 89 App. Div. 500.) This duty applies whether the tree is within or without the highway bounds. (*Messinger* v. *State of New York, supra*; *Brown* v. *State of New York, supra.*) Judge Dye said in *Messinger* v. *State of New York* (*supra,* p. 812): "We hold the State is liable for allowing a condition to exist which should have been observed by the patrolmen in the performance of their ordinary duties. The fact that the trunks of the trees were outside of the highway right of way is no defense, particularly when the limbs and the tops thereof overhung the traveled portion of the highway. (40 C. J. S., Highways, § 257; *Embler* v. *Town of Wallkill,* 57 Hun 384, affd. 132 N. Y. 222.)"

We are satisfied that the State was negligent by the standards set in these cases. It failed both in the duty of reasonable inspection, and in the duty of removal. No expert was needed to discover the dangerous condition of this tree, nor any elaborate inspection. The condition and the danger were perfectly obvious, and had existed for some two and a half years. The failure to see and to act, in such a situation, was negligence.

The State argues that the driver was negligent in failing to see the fallen tree in time to stop the car, and that his negligence is imputable to the owner. We do not find him negligent for two reasons:

First, the evidence indicates that the tree must have fallen only moments before the accident. When it fell, it took down the electric lines. Within three minutes from the time the electricity failed in the adjoining farm house, one of the passengers in the car was at the door seeking help. An occupant of another car which arrived immediately after the accident testified that the tree was still settling. These two facts indicate clearly that the fall occurred only immediately before the collision.

Second, even if the fall had come when the car was still several hundred feet away, and granting good lights and good sight distance, failure to see the tree until nearly upon it was not necessarily negligence. It is common knowledge that at such an hour, before night has fully set in, visibility is difficult at best. Furthermore, we can imagine no large object any more difficult to perceive and distinguish at such a time than a tree in full leaf lying across the path. It would be an ill-defined, shapeless mass merging into the roadside foliage, almost impossible to detect in time to come to a stop.

The claimant's injuries were numerous, painful and serious. He sustained a comminuted fracture of the right femur, a fractured skull, a severe concussion of the brain, a fractured jaw, a fracture of the nasal bones and nasal septum, with severance of cartilage, multiple lacerations about the face, with severance of the supra-orbital nerve and perforation of the ear lobe, and an injury to the brachial plexus at the neck, causing disturbance of the ulnar nerve.

Claimant spent three days at a hospital at Canton, followed by fifty-nine days at Mercy Hospital, Watertown. There he submitted to painful procedures to repair the damage to his jaw and nose, with traction meanwhile applied to his leg. The bone refused to remain in proper alignment, and it became necessary to perform an open reduction operation and secure the broken ends with a metal plate and screws. He was discharged wearing a steel brace and using crutches.

His leg became extremely stiff and despite various treatments there has resulted an 80% loss of flexion of the knee and a substantial loss of flexion of the ankle. The bones knit at a twenty degree rotation from normal, causing claimant to toe in. These effects are permanent and render both walking and sitting difficult and uncomfortable.

Far worse, chronic osteomyelitis then developed in the leg. Massive injections of penicillin proved ineffective, and it was concluded that claimant's body was intolerant to the metal plate and that removal was necessary. An operation for this purpose followed, but one screw was left in the bone, where it still remains. No relief resulted. In October, 1948, a third operation was performed in an attempt to clean out and disinfect the bone. This was complicated by an uncontrollable hemorrhage, necessitating a second incision and blood transfusions. Drainage still persisted, however, at the time of the last day of the trial. Further rest and a wait of many months, followed by a fourth operation, are now advised. The prospects for cure are so uncertain that the condition may for all practical purposes be deemed permanent.

Other permanent results of the accident are extensive facial disfigurement, loss of sensation in the forehead, resulting from the severance of the supra-orbital nerve, loss of sensation and wastage in the fourth and fifth fingers of the left hand, caused by the damage to the ulnar nerve, which condition limits use of the left hand, constriction of the right vestibule of the nose, 13.7% loss of hearing in the left ear, 27.8% loss of hearing in the right ear, and frequent headaches.

Claimant is permanently disabled from work requiring continued standing, or involving danger of a fall or blow to his leg. Even sitting is difficult for him because of his stiffened leg. The leg discharges constantly, with a further operation indicated and no assurance of relief. Previously he was a machinist, earning about $80 per week. That trade and many others are closed to him.

For injuries, including those permanent, scars, pain, suffering and loss of earnings, claimant is entitled to a substantial award, and we hereby grant him the sum of $50,000, together with special damages of $3,889.27, making $53,889.27 in all. In computing the special damages we have allowed all items set forth in the claimant's proposed findings, except an item of $75 for anesthetists, of which we find no proof in the record, and except for the reduction of the bill of Dr. McAskill from $50 to $43 to conform to the proof.

A reservation of decision, appearing at page 50 of the stenographer's minutes, with respect to the admission of evidence of settlement by claimant's insurer with other passengers, is now resolved in favor of the claimant. We are now of the opinion that the evidence was improper, and claimant's objection thereto is sustained. Likewise, we sustain claimant's objection to the reading of a police blotter report of the accident on the authority of *Needles* v. *New York Railways Corp.* (227 App. Div. 276) and *Johnson* v. *Lutz* (253 N. Y. 124). We admit, however, the statement made by the driver to the State Police officer as an admission against interest by one operating a car with the claimant's consent, although we deem the evidence thereby secured to be quite insufficient to raise any serious question of contributory negligence.

In the companion case brought by the Security Mutual Fire Insurance Company, the evidence shows that that company issued a policy of collision insurance to the claimant; that it paid claimant $1,325 in full settlement for the damage to his car, and thereafter received $377.50 in salvage therefor, making its net payment $947.50. In view of the holding in the *Fitzgerald* case, the claimant insurance company is entitled to an award in this amount.

Findings of fact and conclusions of law in conformity with this opinion may be filed within fifteen days from the date hereof, otherwise this opinion will be considered the decision.

Let judgment be entered accordingly.