EDWARD J. HENSLEY *v.* MONTGOMERY COUNTY, MARYLAND ET AL.

[No. 602, September Term, 1974.]

*Decided March 20, 1975.*

362

The cause was argued before MORTON, DAVIDSON and LOWE, JJ.

*James L. Baer*, with whom was *Robert P. Brady* on the brief, for appellant.

*Craig S. Rice*, with whom were *McInerney, Layne & McCormick* on the brief, for appellee Montgomery County, Maryland.

*Jeffrey R. Schmieler*, with whom were *Carlton L. Saunders* and *Saunders & Schmieler* on the brief, for other appellee.

LOWE, J., delivered the opinion of the Court. DAVIDSON, J., dissents and filed a dissenting opinion at page 371 *infra*.

Edward Hensley was driving to the River Falls Subdivision which was his place of employment located on Stable Lane west of Brickyard Road in Montgomery County. The new development contained homes already occupied by "one hundred, one hundred twenty five" families, whose ingress and egress was obtained by use of Brickyard Road, an eighteen foot wide secondary roadway running north from MacArthur Boulevard at which point appellant had entered it. Its asphalt surface succumbs to a gravel surface a few hundred yards past Stable Lane where appellant turned to reach his place of employment, as did "fifty to seventy-five percent" of the "probably . . . one hundred fifty" other employees. Moments after appellant turned off MacArthur Boulevard onto Brickyard Road — but well

before the Stable Lane turnoff — a large tree limb from a dead tree fell through appellant's windshield seriously injuring him. Appellant sued Olga Mary Mazza, the apparent owner of the property adjoining the road, as well as Montgomery County, the governing body responsible for the road. At the conclusion of the presentation of his case, a verdict was directed against him and judgment entered accordingly. It is from that judgment that he now appeals.

Appellant had driven past this point twice a day, to and from work, for about six months but failed to notice either "the limb or the tree" which set back approximately 15 to 16 feet from the road. The tree from which the limb fell was located on a 219 acre wooded tract, neither developed nor inhabited. There is no evidence, even from appellant's father who worked with him and who had particularly observed the tree in question from time to time, that the limb overhung the road. From the photographs in evidence the tree's branches appear to have grown upward rather than outward.

The appellant's father testified that the nature of his work for the past twenty-eight years entailed the removal of dead trees from building sites. This experience caused him to note the presence of the dead tree during the calendar year before the accident occurred.

> "I have seen the tree before, probably 1970, or I had noticed the tree dead. Of course, I do notice dead trees. We look very carefully when we are working when we are clearing and they do stand out to me."

However, Mr. Hensley stated that "It didn't seem to create any hazards or any problem in [his] opinion ...." Furthermore he indicated that:

> "... probably the tree would never stand out or no one else would ever notice. The kind of work I am doing, it is noticeable to me."

Appellant concedes that the fall of the limb was due to the natural process of decay.

To impose a liability upon the landowner, appellant must have shown not only that the tree constituted a danger to the lawful users of the abutting public road, but that the owner of the land upon which it stood was cognizant of the deteriorated condition of the tree or should have been cognizant of its condition.

The evidence produced by appellant was summarized and considered by us "in the light most favorable" to him as we must when reviewing the propriety of a trial court's grant of a motion for directed verdict. *Ramsey v. D.P.A. Assoc.*, 265 Md. 319. The evidence showed no actual notice that the condition of the tree constituted a danger to travelers on the road, either express or implied, to either appellee. Any inference which might have arisen from appellant's father's having seen the tree prior to the accident was negated by his own apologia for having done so, an opinion he buttressed with his self-styled expertise. In order to prevail then, appellant must rely upon constructive notice which rests upon strictly legal presumptions, as opposed to implied notice which is a form of actual notice arising from inferences of fact. *Baltimore v. Whittington*, 78 Md. 231, 235.

Authority upon which to rely is limited indeed by the peculiar nature of the accident. The likelihood of a portion of a tree falling from natural causes coinciding in time and space with a passing motorist so as to cause him injury is so remote as to have been but twice reviewed by Maryland's appellate courts — and those over a half-century ago, *Ver-Vac Bottling Co. v. Hinson*, 147 Md. 267 involving an active intervening cause, and *Washington County v. Gaylor*, 140 Md. 375, which did not have before it the question of liability of an abutting landowner. Broader research, however, discloses that such accidents have occurred in several jurisdictions, indicating that they are less than remarkable, albeit fortunately infrequent. *See* Annotations, 11 A.L.R. 2d 626; 72 A.L.R. 615; 49 A.L.R. 840 and 19 A.L.R. 1021. Once one is awakened to the possibility, a roadside review of dead or dying trees during a single Sunday drive makes it wondrous indeed that such accidents are not a relatively common occurrence.

The cases reviewed ponder what duties should be assigned to 1) the governing body responsible for the safe condition of the road in question, *Cf., Carroll County v. Staubitz*, 231 Md. 309; *Birckhead v. Baltimore*, 174 Md. 32; *Baltimore County v. Wilson*, 97 Md. 207; and 2) the adjoining property owner who is charged with the legal duty *"sic utere tuo ut alienum non laedas"* — so use your own as not to injure another. *Brandywine Hundred Realty Co. v. Cotillo*, 55 F. 2d 231 (3d Cir.).

Disregarding for the moment the refinements of proofs requisite at a trial, the most troubling cases throughout the country have been those such as this, where there was no actual notice of the dangerous condition (dead tree). In addition to a landowner's duty to exercise reasonable care to prevent the fall of a tree into a highway, some courts imposed a duty entailing constant and periodic inspection to discover the natural processes of decay of trees abutting highways. Since we are faced with two defendant appellees, we will discuss the law relating to the landowner first and the County thereafter, noting in advance that the standards for each are not altogether dissimilar.

## The Rural Rule

One reason Professor Prosser has been considered the "King of Torts" is his ability to state succinctly a principle encompassing the results of state by state study of an issue. Our own review verified the accuracy, both within and without this country, of his statement on the inspection question:

> "The rule of non-liability for natural conditions was obviously a practical necessity in the early days, when land was very largely in a primitive state. It remains to a considerable extent a necessity in rural communities, where the burden of inspecting and improving the land is likely to be entirely disproportionate not only to any threatened harm but even to the value of the land itself. Almost without exception the cases applying it have arisen in the country. But it is scarcely

suited to cities, to say that a landowner may escape all liability for serious damage to his neighbors, merely by allowing nature to take its course. There are indications that a different rule is developing as to urban centers.

This is well illustrated by the cases of dangerous trees. *It is* still *the prevailing rule that the owner of rural land is not required to inspect it to make sure that every tree is safe, and will not fall over into the public highway* and kill a man, although there is already some little dissent even as to this, and at least *if the defendant knows that the tree is dangerous he will be required to take affirmative steps.* But *when the tree is in an urban area, and falls into a city street, there is no dispute as to the landowner's duty of reasonable care, including inspection* to make sure that the tree is safe. The cases of trees therefore suggest that *the ordinary rules as to negligence should apply in the case of natural conditions, and that it becomes a question of the nature of the locality, the seriousness of the danger, and the ease with which it may be prevented."* [Emphasis added]. W. Prosser, *Law of Torts*, (3rd ed.) § 57 at 362, 363.

To those who dwell in urban areas with one or two trees in their yard at most, the onus of inspection is modest. The farmer, the developer or the landed gentry who owns large and sometimes sprawling tracts of woodland adjacent to or through which a road has been built, may find the task of inspecting for trees dead, dying. or decayed so potentially onerous as to make property ownership an untenable burden. This would be particularly true for an absentee landowner.

The rural rule not requiring inspection has been recognized by the *Restatement* where the liability of urban property owners is treated as an exception to the rural rule.[1]

---

1. Other authority considers the duty to inspect the "rule" and the relief afforded rural owners the exception.

Comment upon subsection (2), 2 *Restatement 2d, Torts,* § 363. Throughout the country the courts have accepted the distinction between rural and urban lands and generally absolved owners of rural wooded lands from the duty to inspect trees to ascertain whether they are defective. See, *e.g., Lemon v. Edwards,* 344 S.W.2d 823, (Ky.); *Zacharias v. Nesbitt,* 185 N. W. 295, (Minn.); *Chambers v. Whelen,* 44 F. 2d 340, (4 Cir.), 72 A.L.R. 611; *O'Brien v. United States,* 275 F. 2d 696, (9 Cir.); *Hay v. Norwalk Lodge No. 730, B.P.O.E.,* 109 N.E.2d 481, (Ohio); *Albin v. National Bank of Commerce,* 375 P. 2d 487, (Wash.), and Annotations in 19 A.L.R. 1016; 49 A.L.R. 840; 72 A.L.R. 615 and 11 A.L.R.2d 626.

The reasoning of these cases recognizes the practical difficulty of continuously examining each tree in the untold number of acres of forests bordering roads and contrasts it with an urban homeowner's inevitable awareness of one or a few ornamental trees situate in his yard. In the latter instance inspection is an incident of daily life, in the former it would be a time consuming and difficult effort. The growth and adaptation of the common law to our contemporary concerns should not impose impractical burdens or impossible duties. *But see,* Noel, *Nuisances from Land in its Natural Condition,* 56 Harv. L. R. 772, 791.

### The Suburban Forest

Between the rural rule and the urban exception lies a grey area which is becoming more and more prevalent. As population increase causes city and suburban growth to continually encroach upon rural areas, property owners are encouraged by government to preserve "open spaces" accessible to population centers. Frequently housing demands result in suburbs which have bypassed or enveloped farms clung to tenaciously by those reluctant to give up an accustomed way of life. We have thus created hitherto undesignated "suburban forests" lying somewhere between the rigidity of urban responsibility to inspect and the rural rule limiting liability to actual knowledge of hazardous trees adjoining a public way.

Appellant grasps the descriptive term "suburban-forest" used in *Brandywine Hundred Realty Co. v. Cotillo, supra,* 55 F. 2d 231 (3d Cir.) which he analogizes to the facts here. In *Brandywine*:

> "the plaintiff was driving his automobile on one of the principal through roads of Delaware, *on which a tract of suburban forest abutted,* about two miles north of Wilmington, . . . the tree had been dead for four years. . . ." [Emphasis added].

Appellant reads into the use of that descriptive term an expansion of the urban inspection exception to the suburbs. He presumably rationalizes his desire for restricting the rural rule as did Noel, *Nuisances from Land in its Natural Condition, supra,* 56 Harv. L. R. 772, 791:

> "With the great increase of travel in modern times, and the growing tendency to protect travellers, the imposition on the landowner of the burden of due care in removing such menaces, according to nuisance principles, would seem to be justified in view of the grave harm threatened to users of the highways."

We do not agree that the duty of inspection should be extended to include the owner of this "suburban-forest." Appellant's misplaced reliance on *Brandywine* brings to the fore a distinction found in all the cases applying the rural rule. In each, the "rural highway" is noted as being in reality a country road. While perhaps not controlling, that factor is obviously given substantial weight in those cases. *Zacharias v. Nesbitt,* 185 N. W. 295 (Minn.), 19 A.L.R. 1015; *Chambers v. Whelen,* 44 F. 2d 340 (4 Cir.), 72 A.L.R. 615; see also *Harrison v. New Haven,* 37 Conn. 475; Anno. 11 A.L.R.2d 626, 633; and *O'Brien v. United States,* 275 F. 2d 696, (9 Cir.); [2] *Albin v. National Bank of Commerce,* 375 P. 2d 487,

---

**2.**
"The road upon which appellant was traveling was not a major thoroughfare, and the surrounding countryside was sparsely populated. Consequently, the chance of mishap was lower at the scene of the accident than it was in other and busier areas." *O'Brien, supra,* at 697.

(Wash.).[3] We note that the accident in *Brandywine, supra,* occurred "on one of the principal through roads of Delaware." In contrast the hard surface of the eighteen foot wide road here, ended just below the scene of the accident, indicating something less than a thoroughfare.

The size and type of road is but one factor to be considered. The use of the road is a consideration as well. Accepting every inference favorable to appellant and thus assuming that there were one hundred twenty-five families in the subdivision (presumably not far from the scene) using the road, and adding to that over one hundred construction employees, the amount of traffic nevertheless does not elevate Brickyard Road from one of secondary rural use to a principal highway.

Nor do the one hundred twenty-five homes, the locations of which are somewhere off Stable Lane to the west of the accident scene, implant an oppidan complexion upon the rural vicinage. In none of the twenty-two photographs introduced by appellant are there shown any houses or other evidence of human habitation (save the roadway and appellant's vehicle). To the contrary, the entire scene of the surrounding area appears to be natural, if not virgin, woodland.[4] We were also unable to find testimony indicating otherwise. Appellant's proofs never belied the rural character of the road and thus, as a matter of law, failed to impose liability under the applicable rural rule.

Were we to extend the urban inspection responsibility to

---

**3.** In Albin, *supra,* at 491, the "road though remote, was used extensively by hunters. . . . There is a marked distinction between the duty, with reference to trees, that may be imposed upon owners of land adjacent to city streets or heavily traveled highways and those imposed on owners of forest land adjacent to little-used roads."

**4.** *Compare,* Albin v. National Bank of Commerce of Seattle, 375 P. 2d 487 where the natural condition of the forest had been altered by a logging operation and allegedly "increased the hazard," which could give rise to implied notice. The Court recited with approval an instruction that there was no duty to inspect so long as the forest remained in its natural condition. It was submitted to the jury on the question of actual knowledge implied from the logging operation. We are in accord in Maryland where the sale of standing timber does not relieve the landowner from responsibility for the natural consequence anticipated from its being felled. Ver-Vac Bottling Co. v. Hinson, *supra,* 147 Md. 267.

suburban forests, we would be in effect "legislating" a policy concept. Beyond that, landowners would face nebulous potential liability dependent rather upon the acts of others in developing homesites than upon their own actions. With the easy accessibility to open country provided by modern ways of transportation an owner would be hard put to know what duties were imposed upon him by that ownership.

## Montgomery County

Since the evidence was insufficient to imply that the landowner had actual knowledge, or to charge him with constructive knowledge, nothing can be added peculiarly applicable to the County. The factual proofs fail in that regard as well to this appellee as they did to the other.

Appellant relies most heavily upon *Washington County v. Gaylor, supra,* 140 Md. 375, which also arose from a tree limb-automobile accident. That case, however, was so sparse on facts and law as to provide us little guidance. It is clear, however, that the submission to a jury was based upon implied, actual notice as opposed to constructive notice.

> "Where a large branch or limb of an old tree, bearing such marks or evidence of decay and extending over a public highway in such a position as to render travel thereon dangerous, is allowed to remain in that position a long time, the court would not be justified in instructing the jury that there was evidence of negligence on the part of those specially charged with the duty of keeping the highway 'safe for the travel of the public.' " *Id.* at 378.

Unfortunately the question of constructive notice by way of duty to inspect was not an issue. We cannot conceive, however, that the Court of Appeals intended to direct that every such case leave to a jury the question of the government's duty to inspect and ascertain defects occasioned by natural causes without regard to the use of the road or population pressures of the countryside. Such a duty would be far too great a burden on the taxpayer when

balanced against the purpose to be served. There are still some natural dangers from which we cannot rely upon the government for protection.

*Judgments affirmed.*
*Costs to be paid by appellant.*

*Davidson, J., dissenting:*

I concur in the result reached by the majority with respect to the appellee, Olga Mary Mazza. I dissent from that portion of the majority opinion which affirms the trial court's order of a directed verdict in favor of Montgomery County.

In *Washington County v. Gaylor*, 140 Md. 375, 117 A. 864 (1922), the Court of Appeals recognized that a county is charged with the duty of keeping the county's public roads safe for the travel of the public. It held that it was for the jury to determine whether an accident which occurred when a tree fell upon an automobile traveling along a public road was caused by the defective condition of the tree and, if so, whether the county knew, or by the exercise of reasonable care could have known, of such a dangerous condition in time to have prevented the accident.

In *Gaylor* the record showed that the accident occurred on a public road somewhere in Washington County on 7 August 1920, a day when there was no storm and only a moderate wind. There was also evidence to show that the tree in question was an old tree which stood 15 to 26 feet from the center of the highway; that one of its limbs was 60 to 70 feet high and extended across the highway; that at various places on the tree there was evidence of decay; that there were large cracks in the trunk; and that that condition of the tree had existed for "some time" before the accident.

Here, viewing the evidence in the light most favorable to the appellant, the record shows that the accident occurred on 2 August 1971 on Brickyard Road, a public road located in what, until 1967, had been a rural neighborhood in Montgomery County. At the time of the accident the county knew that 125 single-family homes had been constructed in

the area, whose occupants necessarily used Brickyard Road for vehicular ingress and egress. In addition, approximately 75 employees, working on the construction of new houses in the vicinity, also, of necessity, traveled that road to and from work.[1] The accident occurred on a clear, sunny day when no wind was blowing.

There was further evidence to show that the tree which fell and caused the accident stood on privately owned property about 10 to 13 feet from the edge of Brickyard Road; that the tree was approximately 100 feet tall but that none of its limbs extended across the highway; that notwithstanding the fact that it was then August there were no leaves on the tree; that most of the bark on the tree was gone; that the tree had been dead for a "long time" and had been observed to have been dead at least a year before the accident; that at the time of the accident there was a "break" in the top of the tree; and that at that time there was another piece of the dead tree suspended in the limbs of a green tree nearby. A large number of photographs depicting the condition of the tree at the time of the accident were entered into evidence.

In my view this evidence, while not as strong as that offered in *Gaylor*,[2] was nonetheless sufficient to support a

---

1. Knowledge of this ongoing development can be imputed to the county because it issues building permits prior to construction. Montgomery County Code (1972) §§ 8-206, 8-214, 8-215.

2. Here the record shows that the tree was on private property, while in Gaylor, *supra*, the location of the tree is unclear. Courts in other states have recognized that the public authority responsible for maintaining roads has the obligation and authority to abate conditions threatening danger to motorists, even where the peril, and in particular, an offending tree, is located on private property. *See e.g.*, Barron v. City of Natchez, 90 So. 2d 673, 676-77 (Miss. 1956); Fitzgerald v. State, 96 N.Y.S.2d 452, 455 (Ct. Cl. 1950); Brown v. State, 58 N.Y.S.2d 691, 692-93 (Ct. Cl. 1945), *aff'd* 66 N.Y.S.2d 922 (App. Div. 1946); Messinger v. State, 51 N.Y.S.2d 506, 507 (Ct. Cl. 1944); Inabinett v. State Highway Dept., 12 S.E.2d 848, 851 (S.C. 1941).

Here the record shows that the branches of the tree did not extend across the highway. The fact that neither a tree nor any of its limbs are within or over the roadway is not necessarily a prerequisite to a finding of the governing body's responsibility. Baltimore v. Eagers, 167 Md. 128, 136, 173 A. 56, 59-60 (1934). *See* Brown, *supra;* Messinger, *supra.* It has been recognized in Maryland that the county's obligation to keep its roads safe for public travel includes the duty of protecting travelers not only against dangerous conditions located in the roadway itself but also against dangerous conditions located in close proximity to the boundaries of the

rational inference that the county, by the exercise of reasonable care, could have known, in time to have prevented the accident, that the tree which fell was in a dangerous condition. Thus, there was enough evidence to take to the jury the question of whether the county was negligent in failing to keep Brickyard Road safe for the traveling public.

I agree with the majority that the Court of Appeals did not, in *Gaylor*, intend to "direct that every such case leave to a jury the question of the government's duty to inspect and ascertain defects occasioned by natural causes without regard to the use of the road or population pressures of the countryside." The standard of care required of the county in keeping county roads in a safe condition was thoroughly explained in *Staubitz, supra*, at 231 Md. 315, 190 A. 2d 82. There the Court of Appeals said:

> "The standard of care required of county commissioners is to use reasonable care and diligence to keep the county roads in a safe condition. They are not insurers against accidents on the roads. Although the standard of reasonable care remains constant, what is reasonable care in a given situation varies with the conditions present on such road or highway. Reasonable care on a busy, often-traveled highway requires greater diligence on the part of the county commissioners than that required on a relatively little traveled road." (Citations omitted.)

I am suggesting that here there was evidence to show that, at the time of the accident here involved, in excess of 200 persons per day used the allegedly "rural" Brickyard Road, and that the county was aware of the fact that the use of

roadway. County Commissioners of Carroll County v. Staubitz, 231 Md. 309, 314, 190 A. 2d 79, 82 (1963); *see* Birckhead v. City of Baltimore, 174 Md. 32, 36-37, 197 A. 615, 618 (1938).

Here the evidence shows that the tree was dead, whereas in Gaylor, *supra*, there was evidence that the tree had decayed. Direct evidence of decay need not be presented. *See* Brandywine Hundred Realty Co. v. Cotillo, 55 F. 2d 231 (3d Cir. 1932).

that road had increased substantially between 1967 and the date of the accident. Reasonable men could conclude from that evidence that the county had an obligation to inspect and was negligent in failing so to do. In short, the question of whether, under these circumstances, the county failed to use reasonable care and diligence to keep the county roads in a safe condition, was one for the jury. Accordingly, I would reverse the order which directed a verdict in favor of Montgomery County and would remand the case for a new trial.