### SIEGEL,
*Respondent - Cross-Appellant,*

*v.*

## PORTLAND GENERAL ELECTRIC COMPANY et al,
*Appellants - Cross-Respondents.*

### (A8104-02503; CA A34540)

717 P2d 1245

Mildred J. Carmack, Portland, argued the cause for appellant - cross-respondent Portland General Electric Company. With her on the briefs were Roland F. Banks, Jr., and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Chris L. Mullmann, Portland, argued the cause for appellant - cross-respondent Pacific Northwest Bell Telephone Company. With him on the briefs was Ragen, Roberts, O'Scannlain, Robertson & Neill, Portland.

Denny Z. Zikes, Portland, argued the cause for respondent - cross-appellant. With him on the brief was Zikes, Kayser, Freed, Smith & Heald, P.C., Portland.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Plaintiff in this wrongful death action is the personal representative of Robert Jaynes, who was killed when he drove his motorcycle into an unshielded guy wire attached to a utility pole. The wire is owned by defendant Pacific Northwest Bell (PNB), and the pole is owned by defendant Portland General Electric (PGE). The jury found that defendants were negligent and that their comparative fault was greater than Jaynes'. Defendants appeal, and plaintiff cross-appeals from the resulting judgment. We agree with defendants that the trial court erred by denying their motions for a directed verdict, and we therefore reverse.

The accident occurred on August 1, 1980, when Jaynes was riding his motorcycle on the grass-covered strip where the pole and wire are located. There is evidence from which conflicting inferences about visibility at the time of the accident could be drawn. However, Jaynes was aware that the guy wire was there, as were the other occupants of the area. Jaynes was a resident of the Surfwood Villa trailer park. The strip adjoins a field which is used as a common area by the residents of the park, but it is separated from the rest of the field by a row of trees. There is a paved road for vehicular traffic on the side of the strip opposite from the trees, and there is a ditch between the strip and the road.

PGE installed the pole in 1946. Pursuant to an agreement with PGE, PNB attached the wire to the pole in 1955. A PGE crew serviced the pole in May, 1976, for reasons unrelated to the guy wire. PNB personnel entered the trailer park at some time in the middle 1970's to repair a cable pedestal that had been damaged by a car, but they were not in the immediate vicinity of the pole. There is no evidence that employes of either defendant were near the pole or in the general area on any other occasion between the time when the wire was installed and the time of Jaynes' death.

The parties appear to agree that, when the unshielded wire was installed, it presented no safety hazard. The area was rural and undeveloped. However, substantial development took place between 1955 and 1980. The trailer park was developed in phases over the approximate period from 1971 through 1977. Houses and schools were built in the

general area and, in 1979, regular bus service was introduced. Both defendants have internal policies to the effect that guy wires are to be shielded if they are likely to come into contact with traffic, people or animals. Neither defendant conducts regular inspections of poles and guy wires. PNB owns or jointly uses 352,000 utility poles in the state. Both defendants rely on external reports to make them aware of problems with or necessary precautions involving poles and wires. No such reports had come to their attention with respect to the pole or wire in question.

The essence of plaintiff's theory is that defendants had an ongoing duty to inspect the pole and wire or, alternatively, that they knew or should have known about the changes in the demographics and use of the general area and of the strip itself. Consequently, she alleges, defendants were negligent in failing to inspect and in failing to take precautions, *e.g.,* by shielding the wire, to protect against injury. Defendants moved for a directed verdict on the grounds that they did not have the duty to inspect or the knowledge ascribed to them by plaintiff and that, even if they did have an inherent duty or one arising from knowledge, its performance would not have resulted in their finding anything about the strip, the pole or the wire that would have called for their taking protective measures.[1]

The most analogous case the parties cite is *Rice v. Florida Power & Light Co.,* 363 So2d 834 (Fla App 1978), *cert den* 373 So2d 460 (1979), on which defendants rely. The plaintiff's decedent in that case was electrocuted when a hand-controlled model plane he was operating collided with the defendant power company's uninsulated utility lines,

---

[1] The specific bases for PGE's and PNB's assertions that they had no duty to inspect differ in some respects. PGE relies in part on the theory that it was simply a lessor of the portion of the pole to which the wire is attached and that any duty that might have existed was PNB's. Our disposition makes it unnecessary for us to address that theory.

The motions to direct a verdict were also predicated on the ground that the pole and wire were installed more than ten years before the accident and that the action is therefore barred by ORS 12.115(1), the statute of ultimate repose. Although that question might be the threshold one in the usual analytical sequence, the answer to it in this case turns on the merits of the other bases for defendants' motion, *i.e.,* whether they had a duty which they performed negligently or failed to perform *within* the statutory period. Defendants do not argue that the action is time-barred for any reason other than the passage of ten years since the pole and wire were installed.

which had been installed in 1955. The original installation of the lines satisfied "acceptable engineering procedures." The fatal injury occurred in 1975. The trial court granted summary judgment for the power company. The Florida court stated, in affirming the judgment:

"Appellant contends that a change in the use of the underlying property from the time the lines were installed to the time of the accident, from one of expanding residential growth to one serving primarily recreational purposes, coupled with a change in the service provided by the uninsulated distribution wires, created genuine issues of material fact as to whether FPL should have re-located the lines, insulated them, elevated them still higher, or warned users of hazards.

"The field has been used in recent years for general recreational purposes by students of the university and nearby residents. Affidavits in opposition to defendants' motions for summary judgment indicate that a model airplane attached to a hand control instrument has been flown over the field at least once prior to the accident, but nothing in the record shows that FPL had any actual notice of that fact. (Indeed, the accident appears to be the first in FPL's history in which an injury resulted from flying a model airplane into a power line.) Affidavits also indicate that kites, and model planes, with or without hand controls, had been flown over the field. Again, there is no indication that FPL had notice of this.

"* * * * *

"* * * [T]he key to a determination of whether the trial court was correct in rendering summary judgment in favor of FPL is whether or not it would be reasonable to conclude that the changed use of the land underlying the uninsulated, but clearly visible, power lines, was such a circumstances [sic] as would impose upon the utility company a continuing duty to foresee and protect against the type of injury herein at issue, in the absence of actual notice.

"* * * * *

"The case most nearly on point is *Richmond v. Florida Power & Light* [*Co.*, 58 So2d 687 (Fla 1952)], which upheld a summary judgment in favor of the power company. In that case, plaintiff was flying a radio transmitter consisting partly of a box kite attached to a copper wire, in a residential area, and was injured when the kite wire contacted the overhead line. While the facts are distinguishable, and the case was

decided prior to the adoption of comparative negligence, the rationale of the decision remains pertinent. The court stated:

> " 'The inherent danger of electrically energized wires is well known to all except those of tenderest age, but . . . the need for successful distribution of so necessary a commodity cannot be defeated by requiring that every conceivable protection be afforded wherever wires carrying it may go, so that anyone who chances to come near may be saved from injury in anything he decides to do, however unpredictable.'

"58 So.2d 687, 688.

"With this admonition in mind, we conclude that, as a matter of law, it would be beyond the bounds of reason to require FPL to foresee an occurrence such as that presented by the instant case. Had a clear view of the exposed lines not existed, or had FPL had actual notice that individuals were flying model airplanes attached to electrical conductors, the changed use of the underlying property might have been sufficiently persuasive to leave the questions of the existence of a duty and a breach of that duty for the resolution of a jury.

"While endorsing the high degree of care to which a power company is held, we decline to impose a continuing duty to protect against any and all activity, however unlikely, occurring in the vicinity of lines which were initially located and installed in a reasonable manner. We hold that FPL's maintenance of its wires in the place and under the conditions described herein did not fall beneath the level of prudent foresight required of a supplier of electricity. Therefore, as a matter of law, appellee breached no duty owed the decedent. * * *" 363 So2d at 837-39. (Footnote omitted.)[2]

No Oregon appellate court decision is as factually similar to this case as is *Rice.* However, *Taylor v. Olsen,* 282 Or 343, 578 P2d 779 (1978), is analogous. The plaintiff was injured when her car struck a tree that had become decayed and had consequently fallen from the defendant's property onto the road. The Supreme Court said:

---

[2] The other out-of-state cases the parties cite are not as helpful. *Ingling v. Public Service Elec. & Gas Co.,* 10 NJ Super 1, 76 A2d 76 (1950), on which plaintiff relies, revolves around particular contractual duties and duties arising out of the defendant utilities' easement over the injured plaintiff's property; the case does not pertain to any general duty that attaches to utility companies by reason of their installation or ownership of facilities.

"This court has not previously had occasion to consider the question of liability for injuries caused by the fall of roadside trees. However, such injuries have long been common enough to develop lines of cases in other jurisdictions. Generally, a possessor's duty of reasonable care toward the traveling public will arise from his actual knowledge of the dangerous condition of the tree. The more difficult question is whether he will be held liable if he should have known of the danger, and specifically, under what conditions he has a duty to inspect his trees to discover a latent danger.

"* * * * *

"* * * [E]xcept for extreme situations, the question of the landowner's or possessor's attention to the condition of his roadside trees under a general standard of 'reasonable care to prevent an unreasonable risk of harm' is to be decided as a question of fact upon the circumstances of the individual case. The extent of his responsibility either to inspect his trees or only to act on actual knowledge of potential danger cannot be defined simply by categorizing his land as 'urban' or 'rural.' * * *

"Even in a rural setting, for instance, it can make a difference whether the defendant or others for whom he is responsible are engaged in activities that involve the trees at the location in question or that alter the natural conditions at this location. Decisions like *Chambers v. Whelen* [44 F2d 340 (4th Cir 1930)] and *O'Brien* [*v. United States,* 166 F Supp 231 (D Or 1958), *aff'd* 275 F2d 696 (9th Cir 1960)], stress the burden and the impracticality of a general duty to inspect standing trees when imposed on owners of large tracts of rural land simply as landowners. As a Maryland court recently summarized its review of the cases, the onus on a homeowner of inspecting a few trees in his yard is modest, but the 'practical difficulty of continuously examining each tree in the untold number of acres of forests' or in 'sprawling tracts of woodland adjacent to or through which a road has been built [can be] so potentially onerous as to make property ownership an untenable burden. This would be particularly true for an absentee landowner.' *Hensley v. Montgomery County,* [25 Md App 361, 366-67, 334 A2d 542, *cert den* 275 Md 750 (1975)]. It is less obviously true, however, for one who is engaged in logging or in actively developing the land. Thus our neighboring State of Washington, where standing timber plays much the same role as in Oregon, distinguished *O'Brien, supra,* and permitted a plaintiff injured by a fallen tree on a 'remote' road to go to the jury against a bank as owner of forest land because

the land was not in its natural condition but had recently been logged. *Albin v. National [Bk.] of Commerce,* 60 Wash 2d 745, 375 P2d 487 (1962). Consequently, we examine the present case with these factors in mind.

"In this case, the road in question was a two-lane blacktop highway serving a number of communities in Clackamas County. There was testimony that it was used by an average 790 vehicles a day; in other words, a fallen tree might encounter a vehicle within an average of about two minutes, depending on the time of day. Defendant had purchased the land adjoining the road in 1973 for logging purposes, and during the five or six weeks before the accident he had logged about half the timber on his land. This included the trees adjacent to the tree on the county's right-of-way that eventually fell onto the road. Under these circumstances, we conclude, as did the Washinton Court in *Albin, supra,* that it would be a jury question whether defendant had taken reasonable care to inform himself of the condition of this tree, provided there was evidence that an inspection would have disclosed its hazardous condition." 282 Or at 345-50. (Footnotes omitted.)

The court went on to conclude that there was no evidence to support a finding that a reasonable inspection would have revealed that the tree was decayed, because "the decay did not extend through the bark, or even to the surface below the bark except perhaps in a few places," and "[t]here was no evidence to suggest that chopping or drilling into the trunk would have been a normal or expected way to examine a standing tree." 282 Or at 350-51. Because there was also no evidence that the defendant was or should have been aware of particular circumstances that called for examining the core of the tree for decay, the Supreme Court affirmed the directed verdict for the defendant.

The considerations relevant to the existence of a duty to inspect here may differ from the factors that were relevant in *Taylor*. Prosser and Keeton, Torts, 391, § 57 (5th ed 1984), cites *Taylor* as an exception to the still "prevailing rule that the owner of rural land is not required to inspect it to make sure that every tree is safe, and will not fall over into the public highway and kill a person." (Footnotes omitted.) Even assuming that that is an accurate characterization of *Taylor,* the Supreme Court's reasoning would nevertheless be a logical

application of the principle stated in the same section of Prosser and Keeton:

> "* * * The public right of passage carries with it, once the highway has been established, an obligation upon the occupiers of abutting land to use reasonable care to see that the passage is safe. * * *

> "* * * [O]ne who wanders into a pit a considerable distance from the road after traversing the adjoining land, even though he does so inadvertently, is denied such protection, and treated as a trespasser. The distance would appear not to be so important in itself, but merely to bear upon the existence of a recognizable danger to the normal users of the highway. * * *"
> Prosser and Keeton, *supra,* at 388-89. (Footnotes omitted.)

It may be that, under the rationale of *Taylor* and of Prosser and Keeton, defendants' failure to inspect the pole and wire would have breached a duty if the pole, wire or both had fallen into the adjacent roadway. However, Jaynes was not injured on a public road, and it does not automatically follow from the reasoning in *Taylor* that a duty existed or was breached by defendants' failure to conduct inspections aimed at discerning risks to users of the strip. The calculus in *Taylor* of (1) the burden of examining every tree, (2) the relative reasonableness of imposing that burden on owners whose activities have familiarized them with or have changed the terrain and (3) the number of users in the area of risk militates against the imposition of a duty of inspection here. As indicated earlier, defendants own or have facilities on a vast number of poles. By definition, poles that have not been inspected or attended since the remote time of their installation are more akin to trees in an untouched forest than trees that have been affected by or learned about through recent operations.

Finally, although the parties do not agree about whether there was *any* evidence of use of the strip (as distinct from the portion of the field on the other side of the trees), the number of inhabitants of the trailer court and other potential users was small and the probability of their awareness of the wire's existence and whereabouts high, when compared to the number of drivers who might encounter or be aware of an obstacle on a public road. We hold that, under these circumstances, defendants did not have a duty to inspect, in the

absence of their knowledge that circumstances called for an inspection to determine if precautions were needed.

■     The remaining questions are whether defendants had or should have had such knowledge and, if so, whether their acting on that knowledge would have led to their realization that precautionary measures were necessary. Plaintiff argues that defendants should have known, on the basis of their awareness of residential and related development in the *general* vicinity, that it was necessary to take protective measures against injuries caused by contact with the unguarded wire. We disagree as a matter of law. The court in *Rice v. Florida Power & Light Co., supra,* held that, unless the defendant knew that the specific activity that resulted in death was taking place on the property under the lines, its awareness of "the changed use" of that property itself was not enough "to leave the questions of the existence of a duty and a breach of that duty for the resolution of a jury." We need not go nearly that far to conclude, as we do, that defendants' knowledge of development in the surrounding environs was not enough to charge them with knowledge that any human activity was occurring in the immediate area of the pole.

Plaintiff maintains that, albeit there was much evidence to the contrary, there was sufficient evidence to support a finding that the strip was being used to a significant extent for recreational purposes, for bicycling and for passage by school children and shoppers. Plaintiff further argues that defendants knew or should have known those facts. The only evidence that can suggest a source of that knowledge was that the PGE crew serviced the pole in 1976. However, there is no evidence that the crew saw or should have seen anything to arouse inquiry about activity near the pole and wire. We agree with PGE that, at that time and, for that matter, at the time of Jaynes' death, the evidence was insufficient to show that an inspection would have disclosed

> "* * * anything other than a pole located on a strip of land which was divided from the main common area by a row of trees, which was separated from the roadway by a ditch, and which showed no signs of regular use."

We hold that the trial court erred by denying the motions for a directed verdict in favor of defendants. In view

of that holding, we do not reach defendants' remaining assignments. Plaintiff's contentions in her cross-appeal are either rendered moot by our holding or do not require discussion.

On the appeal, reversed and remanded with instructions to enter judgment for defendants; affirmed on the cross-appeal.