Caroline K. Simon, J.
On Washington’s Birthday, February 22,1965, claimant Chester Siegel, a 40-year-old dentist, was driving from his home in Roslyn Heights, Nassau County, to his office in The Bronx. He planned to stop en route at his sister’s home and deposit there his son, then 9 years old, and his niece, then 7 years old, both of whom were seated in the back seat of his 1963 Falcon station wagon.
Driving westbound at 9:15 a.m. on the Long Island Expressway between Shelter Rock Road and New Hyde Park Road at a speed of about 40 to 45 miles per hour, he testified that traffic was light, the road was wet and snow was on the ground. *919 Suddenly, in an instant, his car was demolished and “ an enormous tree was sitting in my lap ’ ’. He stated that no noise had been heard nor anything unusual seen by him before the accident, which caused the car’s steering column to be pushed into his legs, made his chest ache, and inflicted severe pain and bleeding.
According to claimant’s testimony, which was supported by photographs as to the car’s damage introduced into evidence, the whole car pushed down upon him, his left arm was distorted, his left hand bleeding through his glove, and his face bleeding.
The accident brought the car to a halt. Claimant turned off the motor and the ignition. People came to his aid. The police arrived soon thereafter, as did the wreckers. The tree was picked up and a group of men pushed it off the car and onto the road in front of the car. The car’s roof was raised up, and then the claimant was pulled out through the window.
Immediately after the crushing blow, the children were silent for 10 to 15 seconds and then began to cry. Apparently unhurt, they were taken from the station wagon by police. A passing motorist who stopped to offer help took the children back to claimant’s Roslyn Heights home.
Claimant, in pain, was taken by ambulance five miles to the North Shore (Manhasset) Hospital where he was admitted to the emergency room. Later, after a doctor had controlled the bleeding of his chest, legs and hand, he was X-rayed and taken to the operating room.
Notice of intention to file a claim was received and filed by the Clerk of the Court of Claims on May 6,1965 and by the Department of Law on May 7, 1965. The claim itself was timely filed in the two offices on March 17, 1966 and alleges negligence of the State of New York in failing to discover a dangerous and deteriorated condition of the tree which caused his injuries, and in failure to maintain it in such a manner to prevent it from becoming rotted, and in failure to inspect it so as to protect the users of the highway. Damages of $200,000 are sought. The claim has neither been assigned nor tried nor brought before any other court or tribunal for determination.
It asserts that claimant suffered fractures of the second and fourth metacarpal bones of the left hand with injury to the surrounding nerves, blood vessels, muscles, tendons, ligaments and other soft tissue resulting in a permanent malalignment of the bone and impairment in- the mobility and dexterity of the said fingers and hand; damage to the ligaments of the left knee; contusions and abrasions of left and right leg and thigh; lacerations of the palm of the left hand, the left forearm, the left *920 wrist, the head and chest; traumatic shock resulting in headaches, nervousness, sleeplessness and anxiety, and arthritis, though free from its symptoms before the accident.
The use of his hands is an essential part of a dentist’s work, as is standing on his feet. According to his testimony and medical proof, claimant’s injuries have unfortunately affected both his legs and his left hand.
Claimant was in the hospital for five days, during two of which he stated he was in constant pain. He left the hospital on February 27, although he remained under continued medical care. Two days later the sutures in his left hand were-removed and a plaster wrist cast was applied, covering the area from one-half inch below his knuckles almost to his elbow. He wore this cast for four to five weeks.
His chest pains diminished from severe pain to none three weeks after the accident, and the left knee also gradually healed to its present condition.
Claimant returned to work on a limited basis on April 19, and resumed full-time practice on July 9, 1965. In an attempt to retain his practice during the February 22 to April 19 period when he did no work, and during the period of limited work thereafter, he increased the working time of his part-time assistant, he wrote a letter explaining his situation and its cause to about 1,000 patients, and he had the part-time voluntary help of dentist friends.
Claimant testified that the pain in his left hand and the occasional spasms in that hand prevent his doing root canal work and any operation in the back of a patient’s mouth, since grasping small objects is not possible with his left hand, nor is he able to work for more than a few hours at a time without some pain.
Claimant, a dentist practising 13 years at the time of the accident, proved loss of income during 1965 of $11,160 which did not include revenue from patients he asserted were lost to him because of his inability to work for a period immediately after the injury. His claim also included $150.80 for clothing destroyed in the accident. His station wagon had cost $2,400 and had only minor repairs and maintenance prior to its total destruction on February 22, 1965. His income tax returns showed an increase in earnings each year prior to the accident.
The court recognizes the accident had a damaging result. It must determine whether the State has responsibility for that result, whether it had the responsibility for maintenance and control and had either actual or constructive notice that the *921 tree might fall and cause harm, and whether the falling of the tree was the proximate cause of the injuries which are the basis of this claim, as well as to determine claimant’s freedom from contributory negligence.
The State recognized that it maintained the tree. On the proof adduced, the court finds that the fall of the tree onto claimant’s car was the proximate and direct cause of the accident. It further finds on the facts before it that claimant was not contributorily negligent.
Expert witnesses produced by both parties agreed that the fallen tree was a tulip tree, one of four leaders from a common stem or root. They also agreed that tulip trees grow to greater heights than most other trees indigenous to this locality. Testimony was received as to the tree’s height varying from 80 feet to 120 feet.
The tulip tree is called: “ a ramrod giant of the forests ”. (The New York Times, April 14, 1968 “ Around the Garden ”, p. 38D.)
The experts also concurred in stating that this tulip tree’s foliage was at the top of the tree. Pruning of the lower branches had last been done on September 16,1962, according to the work records introduced and confirmed by the State’s foreman.
One eyewitness, traveling eastbound on the same road at the same time, testified that he saw the tree fall across the road. He brought his own car to a halt five feet from claimant’s car as the tree crashed down. He also stated that within 15 minutes he saw a light green truck arrive and a man using a chain saw proceed to cut the fallen tree into sections as it lay on the ground. He said that the tree was one of a group of trees growing in the area separating the three-lane westbound portion of the Expressway from the two-lane service road running parallel to and north of it.
An attorney, friend and neighbor of claimant, testified that he was notified of the accident by telephone. He quickly went to the North Shore Hospital to see Dr. Siegel, then returned to the Siegel home to borrow claimant’s camera and went to the scene of the accident where he photographed the tree stump.
He also testified that he kicked pieces of the remaining tree and stump, which was brittle and easily disintegrated. He picked up a piece of the tree, approximately two feet long and nine inches in width, which he stated was lying directly in front of the tree stump, and placed the piece in the trunk of his car.
This witness testified that he turned over the tree section to Mrs. Siegel, and, together, they placed it in a plastic bag. Over *922 the objection of the State, the material as packaged was introduced as claimant’s Exhibit No. 9. There was conflicting proof as to whether or not the condition of the contents of Exhibit No. 9 — stated by claimant to be part of the tulip tree which fell — was exactly or nearly the same as on the accident date. Other proof sustains claimant’s allegation that the tree was decayed before the accident date and the decay was visible to a trained tree expert working across the road, even though not noted by the State’s witness driving past at the minimum speed of 40 miles per hour.
Claimant introduced the testimony of an expert in tree maintenance, who stated that he had been in the business for 32 years. He works as a district manager of a nationwide organization specializing in tree surgery and maintenance, which serves private estates, Nassau County, villages in the county, and, upon occasion, did pruning and removal for the Long Island State Park Commission.
This expert testified that he had inspected Exhibit No. 9 at claimant’s home on August 6,1965, and found it to be a decayed portion of a tree showing evidence of having been attacked by carpenter ants. He stated that these ants attacked exposed portions of trees, areas which are unprotected by live wood covering or bark. He also visited the site of the accident and inspected the stump of what he believed to be the tree, locating it by means of an adjacent road sign depicted in photographs shown to him.
He stated that he found four leaders coming from a multiple or common stem, and that he noted the four stumps had been sawed off close to the ground. He inspected the southerly leader, which he found to be badly decomposed, to an extent of about 50%, and stated that, in his opinion, this condition had existed for at least five years. He explained that tulip wood is fast-growing, quite brittle, and that the three other stumps were relatively sound.
He also stated that he had seen this particular tree while traveling along the expressway on previous occasions when he was inspecting neighboring areas and would have advised its removal if it belonged to one of his clients. He pointed to the fallen sections of the tree in claimant’s photograph as indicating a scar on the lower part of the trunk, the absence of bark indicating decayed wood. In his judgment, the condition of the leader could have been detected by a routine inspection, and the tree should have been removed two and one-half years earlier.
*923 The State’s witness, the tree pruner foreman in charge of detecting and removing dead £nd dying trees along 450 miles of highway in Nassau and Suffolk Counties, testified that he was in charge of and supervised two crews, each consisting of eight men and a foreman, whose duty it was to trim and remove trees, branches, etc., whether as a result of weather, decay, accidents or in order to protect sight lines from excessive growth, and any other measures designed to eliminate hazards to the traveling public. He stated that he had worked for the Department of Public Works for 18 years, and that his records indicated that the trees had last been topped, pruned and removed along that northerly section of the Expressway from September 10 to September 16 inclusive in 1962.
He stated that dead or dying trees were removed entirely when detected, and that he saw no evidence of insects in the four-leader stump, and that his records did not indicate that this particular tree had been pruned in 1962. He admitted that his visual observation of this area would occur from his car moving along the northerly side of the expressway in a non-rush hour at a minimum speed of 40 miles per hour approximately once a month.
It is common knowledge that there had been a drought for some years preceding the accident. This knowledge was suppprted by proof through Federal climatological data. Tree experts agree that prolonged drought affects tree roots and strength. Claimant’s tree expert, working across the road on several jobs, had noticed for some considerable period before the accident that the tree needed repair.
The responsibility of the State in relation to falling trees is the same as that of a municipality, and requires the exercise of reasonable care.
■ It is essential to establish that the State had either actual or constructive notice of a dangerous or hazardous condition of the tree, requiring its removal. There is a duty to use reasonable diligence in inspecting trees that are likely to become decayed and dangerous to users of the State’s highways. Failure to so inspect is negligence which becomes the proximate cause of the accident.
The court finds applicable the statement in Tagg v. City of Lockport (228 App. Div. 319, 321) that: “ The plaintiffs’ claim of negligence in defendant must rest upon non-attention to the tree by the city after constructive notice that the tree was dangerous in that the whole, or some part of it, was reasonably likely to fall upon people beneath it, considering usual climatic conditions in the city of Lockport.”
*924 Cases cited by the State have been studied. Because of factual differences, including one case in which there had been an inspection two days before the accident, another in which the accident was not on the traveled part of the highway, and another in which there was a very high wind and no visible evidence of decay on the outside of the tree, these cases do not control the determination of the subject claim.
The State must be held responsible for permitting ‘ ‘ defective and dangerous trees or parts of trees to remain in locations where they may cause injury to users of the highways, provided, of course, that the State had actual or constructive notice of their condition.” (Mosher v. State of New York, 191 Misc. 804, 805.)
The court finds that the State had or should reasonably have had constructive notice of a decayed condition of the tulip tree, and that its failure to take steps to remedy the condition during the two and one-half year period since the pruning crew had last worked in that immediate area, during which period the decay was visible to an observant and seeing eye, constituted negligence which is the proximate cause of the accident, for which the State must be held liable in damages.
The damage figure excludes the cost of a regular physical checkup for Dr. and Mrs. Siegel, and a revaccination not necessitated by the accident but included in the medical bills.
The damages for clothing were substantiated by a bill for the items destroyed at the purchase price on January 23, 1965. The award of damages includes the clothing damaged but, having been worn, at the reduced price of $50.26.
The destruction of the Falcon station wagon, a 1963 car in good condition, the cost of which was $2,400, is included in the award at $1,250.
The court awards the sum of $31,300 for all damages resulting from the accident, including pain, suffering, permanent injuries, medicine, doctor and hospital bills, clothing, car, loss of earnings, etc., with interest on $1,300.26 from February 22, 1965 to August 22. 1965 and from March 17, 1966 to the date of entry of judgment herein.
Each of the two infant claimants testified, after it was ascertained they understood the meaning of an oath. Both clearly remembered the accident. Both recalled crying at the time and thereafter having some fear of riding in cars, but neither suffered any permanent physical injury, most fortunately, and the court finds no basis for an award of compensable damage to them.