[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
THE ACCIDENT
On October 4, 1987, the plaintiff Berenice Toomey left her home in Watertown, with her husband Edward, and their daughter Brooke, in their 1986 Volkswagen Jetta. The plaintiff, Berenice Toomey, testified that it was raining in Watertown, as it was in Litchfield where they stopped to inquire if her mother, Mary Comporesi would like to join them on a ride to the Mohawk Trail.
The four embarked on their Sunday drive, and as they proceeded north, the rain changed to a mixture of snow and rain, and ultimately, in Massachusetts, to snow. The plaintiff, Berenice Toomey, recalled snow plows being out as they drove to Great Barrington from She observed some downed power lines, but did recall high winds. In Great Barrington, they headed south on Route 7, driving in a wet snow of inches. After driving through North Canaan, just before the intersection of Sand Road and Route 7, the plaintiff, Berenice Toomey, recalled driving around a CT Page 1692 bend, and observing a new building going up on the right side of the road.
At 1:04 p. m., Connecticut State Police Trooper Sarah Kasacek was dispatched to the scene of a motor vehicle accident on Route 7, just north of Sand Road in North Canaan. There she found fire personnel, traffic stopped in both directions, with a large tree limb across the south bound lane of Route 7, across the vehicle occupied by Edward, Berenice and Brooke Toomey, and Mary Comporesi. Mr. Toomey, the driver, and Mrs. Comporesi, in the rear left seat were declared dead at the scene. Berenice Toomey, who was sitting in the front passenger seat, and Brooke Toomey, in a child restraint seat on the right rear seat, were injured.
(Pl. Exhs. 1-4.)
The plaintiff Berenice Toomey testified that she awoke, looking forward, seeing broken glass and hearing people call to her. They told her not to move, that her daughter was fine, but not to turn. She testified they repeated their instructions not to turn. She knew there was a tree right beside her, and was told they were taking care of her husband. She did not recall that her mother was in the vehicle. She felt extreme pain, followed instructions as to being removed from the vehicle, and was taken to Sharon Hospital with Brooke. She was taken by Life Star to Hartford Hospital, where she was treated in the trauma unit. She had sustained a fracture of her cervical spine, among other injuries, but was stabilized. Her brother and a priest informed her of her husband's and mother's deaths a number of hours after her admission.
 II
PROCEDURAL HISTORY OF THE CASE
Pursuant to Conn. Gen. Stat. 4-147, Notices of Claim were timely filed with the Claims Commissioner on March 11, 1988, (Plaintiffs' Exhibits 36, 37 and 48) and on June 24, 1991 permission to sue was granted to the three plaintiffs by the Claims Commissioner (Plaintiffs' Exhibit 38). Pursuant to the CT Page 1693 Commissioner's decision and Conn. Gen. Stat. 4-160, this action was commenced on or about August 5, 1991. The trial commenced on November 3, 1992, without a jury, as required by Conn. Gen. Stat. 4-160 (d).
 III
THE TREE
The Connecticut State Police conducted an investigation of the accident scene as part of their routine duties. Numerous photographs were taken at the scene by Trooper Kasacek. (Pl. Exhs. 5-13 inclusive) Measurements were taken for a "not-to-scale" sketch. (Pl. Exh. 14 attached as Appendix 1 to this opinion.)
The Trooper testified that she saw dead wood on the tree, saved samples of "soft brown wood" which were kept in the evidence locker at Troop B in North Canaan, but were destroyed because no criminal proceeding was brought within two years. The plaintiff, Berenice Toomey, testified that she had observed the tree many times in the past because she and her family had often traveled on Route 7. When asked in cross-examination whether or not she had considered it a "hazard", she said she had never thought of it in those terms. (Mrs. Toomey's testimony, November 4, 1992, page 6.)
Certainly, travelers in New England appreciate the roadside trees, especially those which appear aged, capable of telling many stories of the passage of time. The plaintiff, Berenice Toomey, as most of the citizenry, regards roadside trees with respect. The older the tree, the more reverence to the untrained eye. Even the trained eye will approach the issue of inspection with a healthy degree of respect for the ability of this living thing to withstand time and the elements. Most people, however, are not trained observers of trees, and see only their beauty, their being a place of shade in the summer, and their providing a home for other creatures. Their preservation is of key interest to most members of the public. It is unusual for us to see the tree as a destructive force to either persons or property. CT Page 1694
The defendant, State of Connecticut through its Department of Transportation (DOT), has had the task of inspecting and trimming roadside trees, and has the ability to assess the possible impact of falling limbs on the traveling public. Their regulations provide for the safe maintenance of the State's roads, as will be discussed later. The tree, the co-dominant stem of which fell, causing this accident and the resulting damage, was described by both experts, one for the plaintiff and one for the defendant, as a "hazard tree" In comparing the testimony of the experts, the description of the tree was consistent. There were slight variations with respect to the ability to observe the obvious defects, and a deviation in each expert's belief of what would constitute a reasonable inspection.
Dr. Terrance Tatter, a professor at the University of Massachusetts, and Director of the Shade Tree Laboratory, testified that arborists would look at several criteria before classifying a "hazard tree", including, the foliage and lack thereof as viewed in summer full-foliage season, fullness of branches, size of the tree, species, location of the tree; that is, is it standing alone or in a group. The architecture of the tree is important in assessing whether there is more than one co-dominant stem or if the tree has one stem with high branches. The attachment of any branches, and the way the branch forks is of interest. Additionally, wounds are of particular interest because there may be decay, that is, the response to the wound by the tree, especially in light of the necessary component of age of the tree. Finally, the area in which the tree is located is critical i.e. if the tree is in a target area, that is, near a roadway or home, in or near a frequently used place such that if failure occurred, the tree or part of it would likely hit someone or something.
Dr. William H. Smith, professor of Forest Biology at Yale University, testified for the defendant. He agreed that on October 4, 1992, the tree in question was a living hazard tree. He agreed that decay process was apparent after failure of this tree, and added that the disturbances around the tree were important in CT Page 1695 assessing the hazard, as was the placement of the tree immediately adjacent to the road, insofar as trees immediately by the roadside are more prone to failure because of the stressors of traffic. Dr. Smith and Dr. Tatter agreed that decay was one of the primary reasons that this tree failed. Dr. Tatter attributed failure due to the presence of a root system at the co-dominant stem crotch, further compromising the structural strength of the tree at the precise location of failure. Dr. Smith added the effect of the weather as a cause of failure.
 IV
THE WEATHER
The defendant produced evidence by Dr. Mel Goldstein, professor at Western Connecticut State University, and meteorologist at WTNH, Channel 8 in New Haven. He testified concerning the rather unusual snow and wind storm which occurred on the date of this accident. Dr. Smith listed the weather as one of the two main reasons for the failure of the tree at the precise time that it fell and struck the Toomey vehicle. Dr. Mel, as he is known "on air", referred to the storm as having wind gusts of up to forty (40) miles per hour, with rapidly dropping temperatures, changing the rain to wet snow. The accumulation of snow was largely dependent on the elevation. The DOT reports of the storm which were defendant's exhibit 14 indicated as remarkable, the amount of snowfall at the shoreline, as well as the Danbury area. He testified that one of the remarkable properties of wet snow is its weight, which was compounded by the fact that all of the trees in the area were still in full foliage. The power outages noted were directly related to the timing of this storm.
In cross examination, Dr. Mel conceded that Connecticut is known for its rather extreme weather, and that in fact October was a month, historically, when radical weather changes were known to occur. Among weather conditions noted within the month of October had been tornadoes, seven inches of snow, and ninety (90) degree temperatures. He indicated that it CT Page 1696 was foreseeable that we would have severe weather in Connecticut.
There was considerable debate concerning the careful weather information compiled over the years by Mr. Childs in Norfolk. Clearly, the elevation of Norfolk exceeds that of North Canaan, and the difference and severity of weather in Norfolk is well known locally. The evidence was clear that the weather on October 4, 1987 was unusual and severe. It is also clear that there is nothing unusual about severe weather in northwestern Connecticut.
While the testimony of Dr. Smith was credible on the issue of the weather being a factor in the failure of the tree at that precise moment, it is not dispositive of the issues of liability in this action. Many trees along the roadside withstood the severity of this storm. Were it not for the decay and the fact that this tree had been environmentally compromised, as agreed by the expert evidence, failure would not necessarily have been caused by the weather. Based upon the evidence presented, the court cannot find that the weather was a significant contributor to the failure of this tree.
 V
LIABILITY
The theory of recovery advanced by all three plaintiffs is common law negligence. The starting point for any negligence inquiry is the identification of a breach of duty by the purported tortfeasor. The threshold question that exists, therefore, is whether a duty exists.
The General Assembly, in accordance with ArticleEleventh, 4 of the Connecticut Constitution has established the office of the claims commissioner, granting to the claims commissioner the power to waive the state's sovereign immunity when he "deems it just and equitable" and to authorize suit "on any claim which, in his opinion, presents an issue of law or fact under which the state, were it a private person, could CT Page 1697 be liable." General Statutes 4-160 (a). When the claims commissioner waives immunity the rights and liability of the state in the action "shall be coextensive with and shall equal the rights and liability of private persons in like circumstances." General Statutes 4-160(b).
The State of Connecticut argues that the granting of authority to sue the state is not equivalent to a finding that there exists a duty to inspect trees. The state further argues that the duty is a public or governmental duty, and that the liability, if found, is not simply that of a private person, but rather a private person in like circumstances to the state. The court agrees that the grant of the claims commissioner is not a finding that there is a duty of care under the circumstances of this case.
The court is not persuaded that the State of Connecticut owes a lesser duty of care than private owners of property abutting a roadway. Thus, the state in this case steps into the shoes of a private landowner in a similar situation. Whether or not the state is liable in this case can only be determined by focusing on whether or not a private landowner would be liable.
"The existence of a duty is a question of law and `[o]nly if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand.'" Petrillo v. Kalman, 215 Conn. 377, 382-83, 576 A.2d 474
(1990), quoting Shore v. Stonington, 187 Conn. 147,151-52, 444 A.2d 1379 (1982). The element of a duty of care is essential in a negligence case. Calderwood v. Bender, 189 Conn. 580, 584, 457 A.2d 313 (1983). "A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." Coburn v. Lenox Homes, Inc., 186 Conn. 370,375, 441 A.2d 620 (1982).
It is well settled that the law requires property CT Page 1698 owners to guard against probable dangers. Attardo v. Ambriscoe, 147 Conn. 708, 712 (1960). They have an affirmative obligation to keep in safe condition that property over which they have control. Nobel v. Housing Authority, 146 Conn. 197, 200 (1959).
In determining the existence of duty, foreseeability plays a fundamental role. "The test is: would the ordinary prudent man in the position of the defendants, knowing what they knew or should have known, anticipate that harm of the general nature of that suffered was likely to result" Id. at 201. "This does not mean foreseeability of any harm whatsoever or foreseeability that the particular injury would occur. It is, in short, the foreseeability or anticipation that harm of the general nature of that suffered would be likely to result, which gives rise to the duty to use due care, breach of which might constitute negligence." Wright, FitzGerald Ankerman, Connecticut Law of Torts, 3rd Ed. 29 at 45 (1991).
Once duty has been established, the next issue which must be addressed is whether the defendant has deviated from the standard of care. If the defendant's actions or inactions "create an undo risk to others", there has been a deviation. Logan v. Greenwich Hospital Assn., 191 Conn. 282, 299 (1983); Restatment [Restatement] (Second of Torts 463, comment b (1965). "Errors in Judgment which occur with the best intentions constitute negligence if they result from the failure to use reasonable care." Logan v. Greenwich Hospital Assn., supra at 299.
Negligence becomes "actionable" if two additional companion criteria are satisfied. The plaintiff must suffer harm, and a causal connection must be established between the harm or injury suffered and the duty breached. ". . . [A] causal connection between the defendant's breach of duty and the resulting harm to the plaintiff are essential elements of a cause of action in negligence." Catz v. Rubenstein, 201 Conn. 39, 44 (1987).
The duties owed by an owner of land abutting a public highway have received a great deal of judicial attention within Connecticut and CT Page 1699
 "[t]hese cases establish[ed] beyond question the rule that an owner of property abutting on a highway rests under an obligation to use reasonable care to keep his premises in such condition as not to endanger travelers in their lawful use of the highway; and that if he fails to do so, and thereby renders the highway unsafe for travel, he makes himself liable. . . . Irrespective of authority, the rule is one of public necessity."
Kane v. New Idea Realty, 104 Conn. 508, 515 (1926), quoting Ruocco v. United Advertising Corporation,98 Conn. 241, 247 (1922). "Particularly the authorities feel that there might [be] liability for the maintenance of trees bordering the highway which endanger travelers on the highway." Wright, FitzGerald Ankerman, Connecticut Law of Torts, 3rd Ed. 53 at 137 (1991). The duty is defined by the "nature of the locality, the seriousness of the danger, and the ease with which it may be prevented." Prosser, Law of Torts, 4th Ed. 57 at 356 (1971).
The state cannot claim surprise at the imposition of this duty, as it was in 1871 that the Connecticut Surpeme [Supreme] Court of Errors stated "[t]he owner of the trees standing on the highway are liable at common law for injuries occurring in consequence of their neglect trim them and keep them safe. . ." Hewison v. City of New Haven, 37 Conn. 475, 483 (1871).
In this regard, the Connecticut courts are in harmony with the many jurisdictions which generally state that an owner of land abutting a highway may be held liable on negligence principles under certain circumstances for injuries or damages resulting from a tree or limb falling onto the highway from such property. Husovsky v. United States, 590 F.2d 944 (D.C. Cir. 1978); Seigal v. State of New York, 56 Misc.2d 918,290 N.Y.S.2d 351 (N.Y. Ct. C1. 1968); Hensley v. Montgomery County, 25 Md. App. 361, 334 A.2d 542
(1975); Carter v. Salt River Valley Water User's Ass'n,104 Ariz. 513, 456 P.2d 371 (1969); Albin v. Nat'l Bank of Commerce, 60 Wash.2d 745, 375 P.2d 487 (1962); CT Page 1700 Lebanon v. Edwards, 344 S.W.2d 822 (Ky. 1961); Hay v. Norwalk Lodge No. 730, B.P.O.E., 92 Ohio App. 14,109 N.E.2d 481 (1951).
The Restatement (Second) of Torts, 363(2), supra 258, specifically provides that a possessor of land in an urban area is subject to liability to persons using a public highway for physical harm arising from the condition of trees near the highway. The use of the term "urban" in this section of the Restatement introduces yet a further variation in the application of the rules concerning a property owner's duty or responsibility. In addition, a caveat following 363(2) states that the drafters express no opinion as to whether the rule would apply to a possessor of land in a rural area. Accordingly, an urban-rural distinction has developed throughout the United States wherein the standard of care with reference to rural, farm, timber or little used land is less than that of strictly urban property. The rationale for the distinction between the duty applied to the rural property owner in contrast to the urban owner has been set forth by Deans Prosser and Keeton:
 The rule of non-liability for natural conditions was obviously a practical necessity in the early days, when land was very largely in a primitive state. It remains to a considerable extent a necessity in rural communities, where the burden of inspecting and improving the land is likely to be entirely disproportionate not only to any threatened harm but even to the value of the land itself. Almost without exception the cases applying it have arisen in the country. But it is scarcely suited to cities, to say that a landowner may escape all liability for serious damage to his neighbors, merely by allowing nature to take its course. There are indications that a different rule is developing CT Page 1701 as to urban centers.
 This is well illustrated by the cases of dangerous trees. It is still the prevailing rule that the owner of rural land is not required to inspect it to make sure that every tree is safe, and will not fall over into a public highway and kill a man, although there is already some little dissent even to this, and at least, if the defendant knows that the tree is dangerous he will be required to take affirmative steps. But when the tree is in an urban area, and falls into a city street, there is no dispute as to the landowner's duty of reasonable care, including inspection to make sure that the tree is safe. The cases of trees therefore suggest that the ordinary rules as to negligence should apply in the case of natural conditions, and that becomes a question of the nature of the locality, the seriousness of the danger, and the ease with which it may be prevented. (Emphasis added).
Prosser and Keeton, Law of Torts, (5th ed. 1984) 391, Section 57.
The cases applying this distinction often state that the urban owner has a duty of reasonable care relative to the tree, including inspection to make sure that it is safe. The duty placed upon the urban land owner, who has only a few trees, is not a heavy burden. This is in contrast to the rural landowner who may have trees of forest dimensions which would impose a duty of immense proportions, and constitute an onerous burden. Hensley v. Montgomery County, supra.
This court, however, declines to adopt the urban-rural distinction because today it is over simplified. CT Page 1702 Moreover, this clear distinction has become less workable with the growth of suburbs and the increase of traffic through rural countryside. See Albin v. Nat'l Bank of Commerce, 60 Wash.2d 745, 375 P.2d 487 (1962); Hensley v. Montgomery County, supra. The extent of his or her responsibility either to inspect his or her trees or only to act on actual knowledge of potential danger cannot be defined simply by categorizing the land as "urban" or "rural." Surely it is not a matter of zoning or of city boundaries but of actual doubt one would expect more attentiveness of the owner of an ornamental tree on a busy sidewalk or street (see e.g. Turner v. Ridley, 144 A.2d 269 (D.C. Mun. App. 1958); Plesko v. City of Milwaukee, 19 Wis.2d 210,120 N.W.2d 180 (1968)), then a seldom traveled roadway in a rural area.
Moreover, the "urban" versus "rural" distinction suggested is too arbitrarily drawn to accurately reflect the results of the important decisions in this area of the law. See generally, McCleary, The Possessor's Responsibilities as to Trees, 29 Mo.L.Rev. 159 (1964). Cases which have denied liability on the basis of the character of the locality involve trees, often in forests, adjacent to remote, little traveled roads, where the risk of harm is clearly outweighed by the burden of placing a duty to inspect on the owners of large tracts of land. See e.g., O'Brien v. United States, 275 F.2d 696 (9th Cir. 1960); Lemmon v. Edwards, 344 S.W.2d 822 (Ky. 1961). Although this court approves those decisions, this court sees little reason why a possessor of land with trees adjacent to a heavily traveled roadway should be automatically relieved of liability merely because the locality is to be labeled as "rural," regardless of how great the risk and how small the effort needed to eliminate it.
In any negligence action the duty owed is related to the hazard presented. "Circumstances existing at the time are to be considered in determining what a reasonably prudent man would have done or would not have done. Thus, when the situation involves danger, the reasonably prudent man would be expected to take greater precautions or be more alert." Wright, FitzGerald Ankerman, Connecticut Law of Torts, 3rd CT Page 1703 Ed. 30 at 46 (1991). "Knowledge of a dangerous condition generally requires greater care to meet the standard of reasonable care." Rodriguez v. New Haven,183 Conn. 473, 479 (1981). The standard of care is unvarying that of an ordinary prudent person under the circumstances surrouding [surrounding] him but as suggested by the court, the degree of care varies with the circumstances." Id. (emphasis in original). "Care is always to be proportionate to attendant requirements and hazard." Geoghegan v. G. Fox Co., Inc., 104 Conn. 129,134 (1926). In determining the appropriate level of care, the defendant is "chargeable with notice of dangers of whose existence he could become aware by reasonable exercise of his faculties." McDonald v. Connecticut Co., supra. Hence, the duty to inspect a given tree increases as the risk of harm increases.
In addition, the appropriate level of inspection and maintenance of a particular roadway depends not only on the expense and burden of various maintenance programs, but also on the characteristics of the surrounding land and the roadway itself, including the type and extent of dangers posed thereby. See Hensley v. Montgomery County, supra. For instance, a seldom travelled roadway in a heavily wooded, rural area would require fewer inspections and a different type of maintenance than would a heavily travelled thoroughfare in an urban area. Compare O'Brien v. United States,275 F.2d 696 (9th Cir. 1960), with Messinger v. State,183 Misc. 811, 51 N.Y.S.2d 506 (1944). See generally Noel, Nuisances From Land in its Natural Condition, 56 Harv. L. Rev. 772 (1943). Thus, it is necessary to first examine the particular situation presented in the case at bar in order to determine the level of inspection and care which the State was obligated to provide.
The northwest corner of Connecticut is a prized part of the state precisely because it still consists of natural woodland. But as well as providing undeniable beauty and majesty, forests can be sources of danger and discomfort. The northwest corner, however, is by no means isolated from the urban areas surrounding it. To quite the contrary, it contains several well travelled thoroughfares, Route 7 being one of these. A well paved and well maintained through CT Page 1704 artery such as Route 7 invites commuters and other travelers to utilize the road as they would any other limited access artery.
As is reflected in the numerous photographs placed in evidence as well as the testimony of every person having first-hand knowledge of the tree, this red maple was immediately adjacent to Route 7. According to the testimony of Trooper Kasacek, as well as the sketch which she made of the section of roadway involved, the tree was twelve feet, nine inches from the edge of Route 7. (Plaintiffs' Exhibit 13). According to Mark Sullivan, the State's arborist, "Route 7 is a major artery that runs through District 4." (M. Sullivan's testimony, November 5, 1992, p. 14). It was readily apparent, therefore, that the tree was adjacent to an area where it could do great harm, or what was characterized during the trial as a "target" area.
In addition, even defendant's expert, Dr. William Smith, indicated that a tree on the edge of a roadway is more exposed to stress during storms and agreed it was a target tree. (Smith's testimony, November 20, 1992, pp, 17, 43, 49 and 62).
By virtually anyone's definition, the tree in question was extremely large and obviously capable of inflicting devastating loss. According to the testimony of Trooper Kasacek, as well as her sketch, (Plaintiffs' Exhibit 14), the circumference of the tree trunk was 13 feet. The length of the branch which broke from the tree was 39 feet 7 inches. At points, the circumference of the branch which fell was in excess of 8 feet.
The uncontroverted testimony of Dr. Tatter was that the weight of the branch which fell was between five (5) and ten (10) tons. The relationship of this five (5) to ten (10) ton 39 foot branch to Route 7 is readily apparent both from the photo log photographs, (Plaintiffs' Exhibits 51-56) and the photographs taken immediately after the accident which show where the branch landed. (Plaintiffs' Exhibits 1-4). Putting aside all the testimony, the sheer bulk and weight of Plaintiffs' Exhibit 50, a small portion, relatively of CT Page 1705 the branch which fell, graphically illustrates the enormity of the branch.
Although the precise age of the tree could not be determined without an internal examination, defendant's expert, Dr. Smith, estimated that this tree was one hundred fifty years old based upon its size. At this age, according to Dr. Smith, you would take the presence of decay in a red maple "as a given." (Smith's testimony, November 20, 1992, p. 48). Additionally, according to Dr. Tatter, this tree was near the end of its life expectancy in view of its roadside location and the operation of stress factors attendant therewith. (Tatter testimony, November 13, 1993, pp. 58-59).
For more than 100 years, in the State of Connecticut, owners of roadside property have been required to inspect and monitor roadside trees which pose a threat to passersby. The initial requirement imposed by the negligence equation, that of duty, has therefore been met.
Equally as significant, the level of care to which the state is to be held is heightened by the existence of characteristics relating to size, location, age and species over which there is no dispute. Clearly, the State is chargeable with knowledge that the tree was capable of inflicting significant harm and this knowledge raises the degree of care to which it must be held.
The evidence demonstrates that motorists on Route 7 could reasonably assume that the state would maintain the road in such a way as to achieve a level of safety commensurate with other thoroughfares in the State.
The evidence provides sufficient support to conclude that the State did not exercise this standard of reasonable care with respect to the hazard tree on Route 7. The evidence concerning the inherent weakness of V-shaped crotches established that the danger of a stem falling is greater the heavier the branch and the longer the length of time that passes in which the crotch is subject to rot and strain. The tree in CT Page 1706 question supported a large stem that would fall directly across and totally obstruct the adjacent public roadway if it gave way.
Given the undeniable danger posed by the enormous limb that overhung Route 7, the State had an obligation to inspect at least periodically such trees growing adjacent to its highways. Yet the defendant's witnesses testified that this tree nor any other tree posing similar dangers on this portion of Route 7 was individually observed or examined to determine whether disease or weakening was occurring. Moreover, at trial, through the testimony of Mark Sullivan, who testified in both the plaintiffs' and defendant's cases-in-chief, the State revealed the inspection procedures it had in place on October 4, 1987 in order to identify hazardous trees. Had the State exercised these inspection procedures properly, the tree, or at the least the actual branch that fell, would have been identified as a hazard and would have been removed prior to October 4, 1987. Therefore, had the State performed the minimal purported to perform, these inspections would have revealed the potential danger in allowing this tree to remain hanging over Route 7 as a posing threat to the safe travel of those passing by on that busy roadway.
Mark Sullivan, district landscape designer and licensed arborist for the State of Connecticut, testified that he was bound by the provisions contained in the State's Manual of Functions and Procedures on the date the accident occurred. (Plaintiffs' Exhibit 49 and M. Sullivan's testimony, November 5, 1992, p. 16). This manual contained the responsiblities [responsibilities] Mr. Sullivan was charged with in respect to patrolling the roadsides for the identification of hazardous trees. The manual provides in pertinent part: "9.06 Tree Removal: Field forces in the course of their routine highway patrol activities must carefully observe the general appearance of all major trees along the highway being traversed in order to ensure that all trees are kept in a healthy, safe condition. . . . Dead, dying or structurally impaired trees that are judged to be extremely hazardous shall be removed at once." (Plaintiffs' Exhibit 49) (emphasis added). Mr. CT Page 1707 Sullivan agreed that trees prone to failure were to be identified during the course of his travels. (M. Sullivan's testimony, November 5, 1992, pp. 16-17). He also had the authority, once a tree was determined to be, or identified as, a "hazard", to direct that it be removed. (M. Sullivan's testimony, November 5, 1992, p. 16.)
As the principal individual responsible for roadside inspections of trees, and the only individual specially trained as an arborist in District 4, Mr. Sullivan was intimately familiar with the procedures in place for such inspections on October 4, 1987. According to Mr. Sullivan, during the course of his daily travels on official business for the Department of Transportation, one of his principal functions was to "take note of trees", which he did on a daily basis. (M. Sullivan's testimony, November 5, 1992, p. 34).
In making his roadside drive-by inspections, Mr. Sullivan testified that certain factors were critical to his analysis when he was looking for hazardous trees. These factors included: (1) the location of the tree, as trees hanging over major roads were certainly more important than ones hanging over back logging roads; (2) size of the tree; (3) age of the tree, as older trees pose more of a concern as a potential hazard; (4) evidence of dead wood or dead branches; (5) the species of the tree, as some species are more susceptible to failure; (6) tree architecture, including the existence of a V-crotch since "the more acute the angle the weaker the union"; and (7) callus growth, which may indicate internal problems with the tree. (M. Sullivan's trial testimony November 5, 1992, pp. 19-24).
Mr. Sullivan admitted that he drove by the tree in question at all times of the year, including those four or five months when it was not in foliage. (M. Sullivan's testimony, November 5, 1992, p. 29). He drove by this tree on many occasions when he was getting from one place to another in conjunction with this job with the Department of Transportation. (M. Sullivan's testimony, November 5, 1992, p. 29). Although Mr. Sullivan had specifically gone out on CT Page 1708 trips to look at trees within District 4, he never did so with respect to the area of Route 7 where the accident occurred. (M. Sullivan's testimony, November 5, 1992, p. 29). In fact, he never even slowed down to examine the trees in the area adjacent to the accident scene. (M. Sullivan's testimony, November 5, 1992, p. 29.)
Mr. Sullivan's conduct with respect to the inspection of this particular tree is key to the court's finding. When examining photographic evidence of the tree and upon personal inspection of the tree after the incident, he was able to identify many of those factors which he was trained to detect (M. Sullivan's testimony, November 5, 1992, p. 26), and which he found critical to his analysis when determining the existence of a "hazard" tree. Specifically, Mr. Sullivan testified that:
 (1) this tree had a V-crotch (M. Sullivan's testimony, November 5, 1992, p. 31, referring to Plaintiffs' Exhibit 8);
 (2) it had callus growth, indicating internal problems with the tree (M. Sullivan's testimony, November 5, 1992, p. 31);
 (3) the tree base was thirteen (13) feet around and the portion that fell was approximately eight (8) feet around and lorry (40) feet long (M. Sullivan's testimony, November 5, 1992, p. 27);
 (4) it was an aged tree, approximately one hundred fifty (150) years old (M. Sullivan's testimony, November 5, 1992, p. 27);
 (5) it was a solitary tree growing over a roadway (M. Sullivan's testimony, November 5, 1992, pp. 26-27);
 (6) it was a red maple, which species is higher than middle of the road as far as CT Page 1709 susceptibility to failure (M. Sullivan's testimony; November 5, 1992, p. 27);
 (7) it had a co-dominant stem, which was actually the part of the tree that fell (M. Sullivan's testimony, November 5, 1992, p. 28);
 (8) it had signs of a pruning cut, which would indicate decay near the cut (M. Sullivan's testimony, November 5, 1992, p. 31, referring to Plaintiffs' Exhibit 8);
 (9) a portion of the tree showed callus growth (M. Sullivan's testimony, November 5, 1992, p. 31); and
 (10) the tree, particularly the branch that fell, exhibited extensive defoliation (M. Sullivan's testimony, November 19, 1992, pp. 14-15).
Interestingly, Mr. Sullivan was able to identify the presence of these indicators in this tree from a review of the photographs, no more than 11" x 14" in size; yet he failed to notice them when he drove by this over one hundred (100) foot tall tree which was more than thirteen (13) feet in circumference and was less than thirteen (13) feet from the side of the road.
There is no doubt that had Mr. Sullivan performed the general inspection procedures in accordance with those set out in the State's Manual of Functions and Procedures, to which he was bound, he would have discovered these indicators and this tree would have been removed.
Moreover, Mr. Sullivan's testimony indicated that this tree warranted a closer scrutiny than a mere drive-by inspection. Such an inspection would clearly have indicated the extent to which this tree posed a hazard.
Direct examination of Mr. Sullivan by Mr. Meaney, November 5, 1992, p. 32-33: CT Page 1710
 Q: Certainly, before this incident occurred, had you seen this tree with the callus wood, you would have known there were internal problems. Isn't that right?
A: Yes.
 Q: Now, Mr. Sullivan, you've testified that the only inspections that you performed with respect to the trees on this portion of route 7 was driving by in the course of your other duties for DOT. Correct?
A: Yes.
 Q: Isn't it true that where you have a large tree, or a large portion of a tree, hanging over a highway indicate just by its nature a closer scrutiny?
A: Yes.
 Q: Now, in your mind there's no question then if you had walked around this tree prior to [the] incident, you would have seen the indicators that we've been discussing this morning of the internal problems?
A: That's correct.
Mr. Sullivan testified before the Claims Commissioner, and he confirmed at trial, that his "principal form of inspection" was to get out of his vehicle and walk around. (M. Sullivan's testimony, November 5, 1992, p. 34). Had he performed this duty, the tree in question would have been removed.
As importantly, in this case, was his testimony that he never inspected any trees in this section of Route 7. While he had driven by he never conducted a drive-by inspection. He testified that if he had looked, he would have seen the defects in this tree, and taken remedial action. CT Page 1711
The policies of the DOT contain guidelines for reasonable inspections. In this case, those policies were not adhered to.
The potential dangers inherent in a situation such as that in the case at bar, where dense woods are proximate to a well traveled thoroughfare, are obvious. Certainly the defendants obligation to assure a reasonable degree of safety on its streets required that it be alert to the presence of and carefully observe at periodic intervals an enormous, multi-trunked tree that is unusually susceptible to weakening and that has an extremely large overhanging stem (limb) weighing several tons, and that it be prepared to abate such hazards as its inspections revealed.
The State produced the testimony of Charles E. Swanson, the retired tree crew leader of District 4. His testimony was compelling, but he did not share the training of Mr. Sullivan and conceded that he was unfamiliar with the concept of what a living hazard tree was. Relying on the tree crews to recognize and cut dead trees may be reasonable. However, the tree crew, absent direct training by an aborist, is not able meet the standard of care with respect to a living hazard tree.
Mr. Swanson testified that he had never noticed anything about the tree whose co-dominant stem fell, causing this injury. Mr. Sullivan testified that had he looked, he would have seen a problem.
If Mr. Sullivan had looked, and not seen the evidence of decay on the side of the tree opposite that of the road which evidence of decay exceeded his heigth [height], the State could successfully argue that their inspection was reasonable, that they had conformed to the standard of care, and that they had no liability.
Under the distinct facts of this case, they cannot prevail on that argument.
Finally, the photo log technology with its "hazard" identification component was not utilized for this section of roadway. The State's absolute failure CT Page 1712 to employ Dr. Tatter's essential elements of an inspection constitutes a breach of the State's duty to the plaintiffs.
The State cannot claim, in the face of overwhelming evidence of a hazard, that it did not notice these indicators and is, therefore, exonerated by its lack of diligence. A defendant will be deemed negligent for "failing to look, or in failing to observe what is visible when he does look." Prosser, Law of Torts, 4th Ed. 32 at 157 (1971). If the condition is one of which the defendant would become aware through reasonable exercise of his faculties, the defendant is chargeable with notice. McDonald v. Connecticut Co., supra, 17. The position taken by the State is similar to that of the defendants in the two other tree hazard cases of Siegel v. State of New York,56 Misc.2d 918, 290 N.Y.S.2d 351 (N.Y. Ct. Cl, 1968); and Harris v. Village of East Hills, 41 N.Y.2d 446,362 N.E.2d 244 (App.Div. 1977). In both cases, the defendants claimed lack of notice and in both cases the court found the defenses inadequate. Where a "reasonable inspection" Harris v. Village of East Hills, supra, 245 or an "observant and seeing eye" Siegel v. State of New York, supra, 924, would have revealed the dangerous conditions, constructive notice is established.
The court does not find that the State is responsible for inspecting on foot each and every tree along each and every roadway. The tree in question was, by all descriptions a "sore thumb" which, according to Dr. Tatter, was a "text book" example of a hazard tree, not only because of the nature and extent of the defects, but also because of its location and size. It was a prime candidate for injury inflicting failure in the years prior to October 4, 1987, and because of this, it was a prime candidate for removal.
The court does not invite the DOT to summarily denude the roadsides of District 4 of trees. Clearly, the DOT has, as all state agencies, departments, and branches, been asked to function according to its policies and procedures despite budget cuts and reduced personnel. When the State suffered the loss of life and CT Page 1713 property upon the collapse of the Miamus River Bridge along Route I-95, it began a process of inspection and remediation.
The court invites the DOT to revisit its own policy and procedure to ensure that its inspection standards are met. The standards are not those imposed by the court, but rather by their own committment [commitment] to the traveling public. The DOT has imposed upon itself a high standard, which it has met in many instances.
 VI
DAMAGES
A. The Estate of Mary Comporesi
John Comporesi is the Executor of the estate of his mother, Mary Comporesi, who was killed, apparently instantly, in this accident. She was seventy-one (71) years of age at the time of her death. Her life expectancy was 14.32 years. Mrs. Comporesi was retired from a local bank, and was active in volunteer work, as well as her church community. She traveled widely with the senior citizens. Both her son and her daughter testified that she talked about dancing in the year 2000, and both indicated that not only did she mean it, but they felt she would. She was in good health for her age, and spent much time taking care of her grandchildren and assisting her family. Her son testified that he saw her twice a day on school days because he went past her home on East Street in Litchfield on his way from his home in Harwinton to his teaching position in Sharon. He testified that she was very active physically, shoveling snow, moving things in her home, and able to take care of herself and her home without difficulty.
He testified further that she had a good sense of humor, and greatly enjoyed retirement as evidenced by her travels abroad and her work as a justice of the Peace in Litchfield, along with her volunteer work.
The evidence provides the court with a picture of a woman who had completed her work life outside the CT Page 1714 home, but continued to pursue her work within the home, where she remained a stable force for her mature children, and a loving caregiver for her grandchildren. Her life was full, and clearly she had many thoughts of her future. The accident deprived her of fulfilling many of her remaining duties and pleasures, and deprived her family of an integral part of their lives. The court is hard-pressed to place a monetary value on that remaining life, but there is no other way to compensate her estate for her loss. The court awards damages in the amount of Six Hundred Thousand ($600,000.00) Dollars.
B. The Estate of Edward Toomey
Edward Toomey was thirty-nine (39) years old when he died on October 4, 1987. He left his widow, Berenice, their daughter, Brooke, and a child from a previous marriage, who visited with his family. His life expectancy was stipulated to be 35.81 years, which is consistent with the balance of the evidence which can be found concerning him. Mr. Toomey was described as active and outgoing, a tennis buff, downhill and crosscountry skier, who also enjoyed hiking and biking, and was "on the go" all the time. He enjoyed involving his adopted daughter in his activities, and the family traveled together especially during the summer vacation from their respective teaching assignments. He was in good health at the time of his death.
Mr. Toomey was an educator who was highly praised in his work. He was in the process of completing his education in administration, and had recently applied for the position of school principal in two towns. Ironically, one of those towns was North Canaan. His then supervisor, William Bircher, the principal of Middle Gate School in Newtown, testified that Mr. Toomey was an "extraordinary" teacher, and that he knew of his aspirations to be an administrator, and felt that Mr. Toomey would advance accordingly.
Mr. Toomey was the director of adult education in Newtown, and administered that program. He had tenure, and was continuing his education. He planned to complete a degree in Educational Administration at the CT Page 1715 University of Hartford in August of 1987.
Dr. Gerry Crakes was qualified as an expert economist by the plaintiff, Estate of Edward Toomey for the purpose of quantifying the economic loss of Mr. Toomey's life. His calculations were based on customary assumptions as to income and life expenses. If Mr. Toomey remained a school teacher for the peroid [period] of his life expectancy, the economic loss totalled $1,129,572.00. If Mr. Toomey became an administrator, that value would increase to $1,419,904.00.
The court finds that the plaintiff has met its burden of proof on this issue of Mr. Toomey's employability and finds that Mr. Toomey would have completed his career goal in administration sufficient to warrant the finding that the economic loss to his estate is $1,419,904.00, and judgment shall enter in that amount. Furthermore, those predictions which form the basis of the court's finding are based on salary levels which are lower than the range currently statewide. Dr. Crakes utilized salary years from 1982 through 1984.
C. Plaintiff Berenice Toomey
The plaintiff, Berenice Toomey, was gravely and painfully injured in the accident which killed her husband and mother. Her brother testified that he was called by a friend, Trooper Orlando Mo of the Connecticut State Police, asking that he come to Sharon Hospital immediately, because his sister had been taken there by ambulance. In the emergency room, he observed his sister covered with blood, with her head and chest strapped down. She was crying. They told her that her mother was in the hospital in Great Barrington, and prepared her to be transported to Hartford Hospital by Life Star helicopter. She was expressing fear of that flight, which she had testified to in her own testimony earlier in the trial. She was experiencing great pain, and that complaint continued at Hartford Hospital, where Mr. Comporesi joined his sister. There, he and a priest told Mrs. Toomey that both her husband and mother had died in the accident. CT Page 1716
Throughout all of Mr. Comporesi's daily visits to the hospital thereafter, Mrs. Toomey asked why she had not also died in the accident. She was depressed because she had lived, and worried that her daughter Brooke would be afraid when she saw her injured mother. He described his sister in the days following the accident as a completely different person, who had no desire to live.
Mrs. Toomey described her injuries, and her pain and suffering as a result of the accident, as feeling "foreign" in her own body, which was racked with pain. As the emergency workers extracted her from the car, she had pain throughout her body and cuts over areas of her face and legs. She recalled arguing with the hospital personnel about the Life Star trip to Hartford. After her admission to Hartford Hosptial [Hospital] on October 4, 1987, she had surgery on October 13. She was treated before surgery by wearing different braces to immobilize her head and neck.
Ms. Sylvia McKone testified. She is the second cousin of the plaintiff, Mrs. Toomey, and is a registered nurse at Hartford Hospital. She was informed that her cousin was being transported by Life Star into their trauma unit, so she got coverage so that she could be with her cousin that night. Ms. McKone testified that Mrs. Toomey's first concern when she saw her was that no one was telling her what had happened to her husband and mother. Ms. McKone said she replied that Brooke was all right.
Ms. McKone testified that Mrs. Toomey had suffered a fracture of her cervical spine at C-7. At the emergency room, she also had clear fluid coming from her ear, a complication of such a fracture, alerting them to a possible cerebral or spinal leak. The patient was oriented and lucid, but quite frightened. After being told of the grim news by her brother, she was devastated, according to the witness, and focused on the deaths of the others rather than her own injuries.
As the days went on, Ms. McKone spent much time with her cousin, and heard her express her pain, as CT Page 1717 well as her fear of surgery. After being stabilized, and understanding that the surgery was necessary, it was performed by Dr. Becker. She was ambulatory a few days later and recuperated very well in light of the severity of the accident in which she had been injured.
Mrs. Toomey was released from the hospital to the home of her brother, Mr. Comporesi, in Harwinton. Her brother and sister-in-law had been caring for Brooke, and continued to care for her for approximately six weeks. At the beginning of her convalescence, she was unable to do anything for herself. A hospital bed was rented for her use in their home. Her brother had to come in to her in the middle of the night as she would attempt to remove the brace which she was required to wear. She was in constant discomfort from it and had to sleep virtually sitting up.
Mrs. Toomey and Brooke returned home on December 1, 1987 but she was unable to drive until the middle part of January, 1988. Her friends assisted her with shopping and other chores. She remained unable to care for her child. By January 15, 1988, she was able to wear a soft collar and operate a car. Mrs. Toomey returned to part-time employment on February 17, 1988, and worked three (3) hours per day for the balance of the school year.
She complained that she is still not able to do all of the things that she was able to do before the accident, such as yardwork, shoveling, and has frequent headaches. The donor site on iliac bone remains a painful reminder of the surgery. She has been given a fifteen (15%) percent disability of her neck. She remains in psychological counseling for trauma and survivor guilt, as well as the stressors of being a single parent. She testified that her self-concept was "blown apart" and that she has fear of making plans.
Considering the accident, Mrs. Toomey has recovered with her permanent partial disability. Her physical recuperation was rapid after surgery, but she continues to have pain. Her emotional suffering continues and she will require continued therapy to assist her in making a full transition from the CT Page 1718 accident. Her life was dramatically changed, and her ability to deal with the needs of her child have been compromised. Her physical resilience has helped her to go on with the day-to-day requirements of her life as a mother and teacher. Hopefully, her emotional strength will grow over time.
The court had the benefit of the medical bills, which totaled over Twenty-two Thousand ($22,000.00) Dollars. She experienced extreme pain and suffering after the accident, which continues to this date. She will continue to require help for psychological adjustment. The court cannot make her whole, but can only compensate her for her pain and suffering and for her disability. Her life expectancy is stipulated to be 44.39 years, and is consistent with the other evidence adduced at trial. The court awards damages in the amount of Two Hundred Thousand ($200,000.00) Dollars.
Judgment shall enter for each plaintiff and against the defendant in the amounts above.
DRANGINIS, J.
[EDITORS' NOTE: APPENDIX 1 IS ELECTRONICALLY NON-TRANSFERRABLE.]